**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

FARIS ABDUL-MATIYN,

                                        Plaintiff,

        v.                                                          No. 06-CV-1503
                                                                        (DNH/DRH)

GEORGE PATAKI, Governor; ALLEN, Correction
Officer; ROWE, Correction Officer; VALEZQUEZ,
Correction Officer; BENBOW, Correction Officer;
JOHNSON, Sullivan Correctional Facility Senior
Parole Officer; JOHN DOE I, Sullivan Correctional
Facility Audiologist; JOHN DOE II, Sullivan
Correctional Facility Counselor; WALSH, Sullivan
Correctional Facility Superintendent; JOHN DOE III,
Sullivan Correctional Facility Psychiatrist; JOHN
DOE IV, CNYPC Psychiatrist; ELIZABETH
FARNUM, Doctor; DEBROIZE, Doctor; FORSHEE,
Doctor; PETE HANMER, CNYPC Primary Therapist;
TOM MURPHY; JEFF NOWICKI; SHARON
BARBOZA, Director CNYPC SOTP Program;
SAWYER, Director, CNYPC; CNYPC MEDICAL
STAFF; MICHELLE PAYNE, Former CNYPC
Program Rehabilitation Counselor; STEVE CAPOLO;
and LINDA BECKER,

                                        Defendants.

_____

**APPEARANCES:**                                   **OF COUNSEL:**

FARIS ABDUL-MATIYN
Plaintiff Pro Se
Post Office Box 210130
Brooklyn, New York 11221

HON. ANDREW M. CUOMO                    GERALD J. ROCK, ESQ.
Attorney General for the                        Assistant Attorney General
    State of New York
Attorney for State Defendants
The Capitol
Albany, New York 12224-0341

KLOSS, STENGER, KROLL & LoTEMPIO        DAVID W. KLOSS, ESQ.
Attorney for Defendants Allen, Rowe,

Valezquez, and Benbow
69 Delaware Avenue
Suite 1003
Buffalo, New York 14202

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[2] twelve DOCS employees[3] ("State defendants"), four New York City Corrections Officers ("City defendants"), and the Central New York Psychiatric Center ("CNYPC") Medical Staff ("CNYPC defendants"), violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments.  Compl. (Docket No. 1).  Presently pending are a motion to sever defendants Walsh and Johnson pursuant to Fed. R. Civ. P. 21 or, in the alternative, to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 17) and motions to dismiss from the State defendants (Docket Nos.

---

[1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] Abdul-Matiyn initially named twenty-six defendants.  Compl.  By an order entered January 26, 2007, the Court sua sponte dismissed three of the defendants. Docket No. 8. Defendants Pataki and Payne have not been served or otherwise appeared in this action. Likewise, defendants John Does I-IV have neither been served nor further identified. More than 120 days have elapsed since the complaint was filed.  Accordingly, it is recommended that the complaint be dismissed without prejudice as to these six defendants pursuant to Fed. R. Civ. P. 4(m) and N.D.N.Y.L.R. 4.1(b).

[3] Two of the State defendants, Walsh and Johnson, are employed by Sullivan Correctional Facility and, while represented by the same attorney as the other State defendants, have filed separate motions.

2

44, 47),[4] the City defendants (Docket No. 46), and defendant CNYPC Medical Staff defendants (Docket No. 55) pursuant to Fed. R. Civ. P. 12(b)(6). Abdul-Matiyn opposes all motions. Docket Nos. 45, 48, 62. For the following reasons, it is recommended that (1) the motion of Walsh and Johnson to sever be denied and their motion to dismiss be granted in part and denied in part, (2) the State defendants' motion be granted in part and denied in part, (3) the City defendants' motion be denied, and (4) the motion of the CNYPC Medical Staff be granted.

## I. Background

The facts are presented in the light most favorable to Abdul-Matiyn as the non-moving party. See Ertman v. United States, 165 F.3d 204, 206 (2d Cir. 1999).

Abdul-Matiyn "was released from Woodburn [Correctional Facility], after . . . serv[ing] sixteen years and eight months . . . ." Compl. at 13. Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological programs . . . ." Id. However, on May 5, 2005, Abdul-Matiyn was arrested and detained at Rikers Island due to a parole violation. Id.

Upon his arrival at Rikers Island, Abdul-Matiyn complained of "arthritis, back problems (pains), a history of heart problems, a history of blackouts . . ," and kidney and bladder stones. Id. On July 6, 2005, Abdul-Matiyn requested a sick call because he was "having severe back pains, that were making it almost impossible for him to walk . . . [and] a

---

[4] The State defendants initially moved to dismiss which was later discovered to contain an error in the electronic scanning of the documents. Docket No. 47. By an order dated May 29, 2007 (Docket No. 44, Pt. 1), that motion was stricken from the record and replaced by Docket No. 47. Docket No. 49.

tightness in his chest and strong chest pains." Id. at 7.  Abdul-Matiyn alleges that he was

sent back to his cell, and despite his continued complaints, crippling pain, and pleas to go

to the hospital, defendants Allen and Benbow ignored his requests.  Id. at 7-8.  Defendant

Valezquez replaced Allen and "[Abdul-Matiyn] and the inmates informed [her] that [Abdul-

Matiyn] was having chest and back pains . . . [so she] called the hospital and she was told

to send [him] right down."  Id. at 8.  Benbow approached Valezquez to inquire where Abdul-

Matiyn was going and when Valezquez informed her that he was going to the hospital,

Benbow allegedly referred to Abdul-Matiyn by a racial epithet and called the hospital,

instructing them to put Abdul-Matiyn "on the burn".  Id.

    Defendant Rowe met Abdul-Matiyn upon his arrival at the hospital.  Id.  She informed

him that he was "on the burn" and "[d]espite [Abdul-Matiyn's] persistent complaints of chest

and back pains . . ," Rowe did not let him see a doctor until over three and one-half hours

later.  Id. at 9.  Abdul-Matiyn's chest pains had subsided, but he was still suffering from

back pain and was prescribed methocarbamol.  Id.  Abdul-Matiyn contends that the

physician informed him that due to the hospital's faulty equipment, the methocarbarnol was

the only treatment available and that any persisting pain would have to be managed with

Abdul-Matiyn's ability to use his mind to control the discomfort.  Id.

    Additionally, Abdul-Matiyn alleges that on another occasion where he was rushed to the

clinic "due to severe pains [in his] chest, back and belly . . ,", he encountered Rowe, who

stated that "they had something special in store for [Abdul-Matiyn]" and refused to provide

Abdul-Matiyn with immediate medical treatment.  Id. at 12.  Abdul-Matiyn also contends that

some of Rowe's saliva landed on his face and in his mouth while Rowe was speaking to

him and attributed this exchange of bodily fluids to his contraction of Hepatitis B.  Id. at 15.

4

Abdul-Matiyn was supposed to be released from Rikers Island on May 5, 2006.  Id. at 14.  However, at the beginning of April, Abdul-Matiyn was summoned to meetings with the Sullivan Correctional Facility's mental health department.  Id. at 16.[5]  The mental health workers "stated that Albany told them to interview [Abdul-Matiyn] and to send Albany an evaluation;" however, despite Abdul-Matiyn's repeated requests, they would not tell him why Albany required an evaluation.  Id.  During the interview, Abdul-Matiyn was asked questions concerning his religion and alleged involvement with terrorists and terrorist organizations. Id.  Additionally, Abdul-Matiyn contends that the mental health department was misconstruing prior conversations he had with them[6] about his religious beliefs, "distort[ing] and misinterpret[ing his statements] to have it appear that [he] was seeing and hearing things that were not there."  Id.

After the evaluation interview, Abdul-Matiyn was seen by defendant Johnson.  Id. at 17. Johnson asked Abdul-Matiyn to complete additional paperwork, allegedly because Abdul-Matiyn's initial paperwork had been "messed up."  Id.  Abdul-Matiyn "asked if anything came up that would interfere with his release . . . ." and Johnson responded "no unless something else comes up unexpectedly . . . ."  Id.  Abdul-Matiyn continually asked correctional facility staff if there were new developments occurring in his case that would preclude his release; however, "[e]ach defendant expressed . . . that they had no knowledge of anything that would prevent [him] from going home."  Id.

_____

[5] At some point Abdul-Matiyn was transferred to Sullivan Correctional Facility for housing, but the exact date is not reflected in the record.

[6] Abdul-Matiyn states that he sporadically suffered from depression which caused trouble sleeping.  Compl. at 16.  When this occurred, he would "go to mental health and speak with someone and [] get something to help him sleep."  Id.

On May 5, 2005, Abdul-Matiyn was met by Johnson and informed that he was
"suppose[d] to have been examined by mental health the last two weeks before he was to
be released [and] . . . he had to be transferred to Marcy Psychiatric [Correctional Facility] to
be evaluated."  Id. at 18.  Abdul-Matiyn alleges that he was told that his evaluation would be
"three days to a week and no more than two weeks . . . ."  Id.  Abdul-Matiyn was then strip-
searched, shackled, and transported to CNYPC.  Id.  Abdul-Matiyn later alleged that Walsh
authored and signed an application for involuntary commitment and that this information
was readily known by other defendants.  Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶¶ 11,
13-14.

Upon arrival at CNYPC, defendant Murphy allegedly told Abdul-Matiyn that he would "be
[t]here a lot longer than [two weeks because he was] one of the filthy animals [defendants]
have to clean off our streets."  Compl. at 19.  "All of [Abdul-Matiyn's] property was taken
from him," including religious texts and other items.  Id.  Additionally, Murphy informed
Abdul-Matiyn that he would "be [t]here for the rest of [his] life."  Id.  Abdul-Matiyn continually
asked what authority granted defendants the ability to keep him confined against his will,
but defendants did not give him an answer.  Id.

Additionally, Abdul-Matiyn underwent a psychological evaluation upon arrival.  Id.
According to the psychologist, "she didn't see anything mentally wrong with [Abdul-Matiyn] .
. . and that she could not give [him] any answers to his legal questions except that Governor
Pataki instructed them to lock up everyone convicted of a sexual offense by any means
possible, and keep them locked up forever."  Id.

While Abdul-Matiyn resided at CNYPC, the CNYPC defendants, "especially . . . Hanmer,
. . Murphy, . . Nowicki and . . . Payne told [him] he had no constitutional rights . . . to be

6

allowed to practice his religion, have access to the courts or be told why he was [t]here at

CNYPC." Id. at 20.  Additionally, defendant Capolo allegedly refused Abdul-Matiyn's

requests to pray, "tell[ing  Abdul-Matiyn] that he was too busy to allow [Abdul-Matiyn] the

opportunity to pray and [that he] would have to find another time after Capolo got off work to

pray." Id. at 27.  Abdul-Matiyn also contends that Payne "would taunt [him] everyday by

making sarcastic statements about [Abdul-Matiyn] and his religion to groups of people

whenever he was present." Id.   Furthermore, although CNYPC provided kosher meals to

Jewish residents and defendant Becker "told [Abdul-Matiyn] that they would consider

obtaining a contract for halal meals[7] . . .," none were purchased and Abdul-Matiyn was

denied his special religious diet. Id. at 20.

   Abdul-Matiyn also contends that while he was at CNYPC, he was "forcefully strip

searched, on a few occasions and threatened with the threat of being injected with drugs if

he refused to be striped [sic] searched or . . . participate in the programs [t]here at CNYPC,

even if his refusal [wa]s due to his religion or if he w[as] physically ill." Id. at 23.  Abdul-

Matiyn also alleges that Payne threatened him with the punishment of the "side room",

where patients were allegedly "unmercifully beat, kick[ed] and stomp[ed] . . . ." Id. at 28.

Moreover,  Abdul-Matiyn contends that his "room ha[d] not been clean in over six months

and the times [he] ha[d] tried to clean his room with a wet towel; he was threatened with

punishment . . . ." Id. at 23.  Abdul-Matiyn also complains that his confinement was

discriminatory because "defendants . . . came to the determination that they would imprison

males convicted of sexual offenses . . . [since] defendants are targeting only males

---

[7] "Halal" foods are those prepared in accordance with Islamic religious law. See,
e.g., Cyril Glasse, The Concise Encyclopedia of Islam 133, 144, 148 (1989).

convicted of sexual offenses and not females  who commit the same or similar offenses."
Id. at 25.  This action followed.


## II.  Discussion

In his complaint, Abdul-Matiyn alleges that his First Amendment rights were violated because the CNYPC defendants failed to provide him with halal meals, did not allow him to pray, and impeded his access to the courts.  Abdul-Matiyn also claims that he was unlawfully strip-searched and shackled on multiple occasions.  Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to a serious medical need[8] and, liberally construing Abdul-Matiyn's complaint, failure to protect.  Moreover, Abdul-Matiyn contends that his due process rights were violated by his civil confinement and the conspiracy between Walsh and Johnson to have him civilly confined, as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders.  Walsh and Johnson move to sever and, in the alternative, dismiss based upon the failure to (1) abide by the pleading requirements, (2) allege the personal involvement of Walsh, and (3) state a claim with respect to Johnson. The State defendants move to dismiss based upon (1) Abdul-Matiyn's failure to comply with pleading requirements, (2) failure to allege the personal involvement of Sawyer, (3) the

---

[8] Abdul-Matiyn asserts multiple claims of serious medical conditions including inter alia back and chest pain, hearing loss, bladder and kidney stones, Hepatitis B, and arthritis.  Compl. at 5,11, 12-13, 14.  Because only the City defendants asserted an argument controverting Abdul-Matiyn's serious medical need, only the ailments directly pertaining to their involvement with his treatment will be discussed.  Docket No. 46.  These claims primarily concern the complaints of Abdul-Matiyn's chest and back pain.  Compl. at 7-9.

submission of a conclusory complaint with respect to the First and Fourteenth Amendment

claims, and (4) the fact that verbal harassment alleged on the part of Capolo is not

actionable under § 1983.  The City defendants move to dismiss based upon the failure to

(1) comply with pleading requirements, (2) allege personal involvement, (3) exhaust

administrative remedies,[9] and (4) allege a serious medical need.  The CNYPC defendants

move to dismiss based upon Eleventh Amendment immunity.


### A. Legal Standard

Fed. R. Civ. P. 12(b)(6) authorizes dismissal of a complaint that states no actionable

claim.  When considering a motion to dismiss, "a court must accept the allegations

contained in the complaint as true, and draw all reasonable inferences in favor of the non-

movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).  However, "a 'complaint

which consists of conclusory allegations unsupported by factual assertions fails even the

liberal standard of Rule 12(b)(6)."  Gilfus v. Adessa, No. 5:04-CV-1368 (HGM/DEP), 2006

WL 2827132, at *3 (N.D.N.Y. 2006) (citing De Jesus v. Sears, Roebuck & Co. 87 F.3d 65,

70 (2d Cir. 1996) (internal quotations omitted)).  Thus, dismissal is only warranted if it

appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts

which would support his or her claim or entitle him or her to relief.  See Hishon v. King &

Spalding, 467 U.S. 69, 73 (1984); Harris v. City of New York, 186 F.3d 243, 247 (2d Cir.

---

[9] "[F]ailure to exhaust is an affirmative defense . . . ."  Jones v. Block, 127 S. Ct. 910, 921 (2007); see also Paese v. Hartford Life Accident Ins. Co., 449 F.3d 435, 445 (2d Cir. 2006).  Thus, the City defendants' assertion of this affirmative defense in a motion to dismiss is premature but may be revisited at the summary judgment stage.  See Jones, 127 S. Ct. at 921-22 (holding that an inmate is not required to plead exhaustion in the complaint).  Accordingly, the City defendants' motion on this ground should be denied.

1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford

the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled
> to "special solicitude," . . . that a pro se litigant's submissions must be
> construed "liberally,". . . and that such submissions must be read to raise the
> strongest arguments that they 'suggest. . . . .  At the same time, our cases
> have also indicated that we cannot read into pro se submissions claims that
> are not "consistent" with the pro se litigant's allegations, . . or arguments that
> the submissions themselves do not "suggest, . . ." that we should not "excuse
> frivolous or vexatious filings by pro se litigants" . . . and that pro se status
> "does not exempt a party from compliance with relevant rules of procedural
> and substantive law . . . ."

Id. (citations and footnote omitted).


### B. Failure to Comply with Pleading Requirements

"Under the Federal Rules, a 'short and plain' complaint is sufficient as long as it puts the

defendant on notice of the claims against it."  Phillips v. Girdich, 408 F.3d 124, 127 (2d Cir.

2005) (quoting Fed. R. Civ. P. 8(a)).  Additionally, the Federal Rules state that "[a]ll

averments of claim . . . shall be made in numbered paragraphs, the contents of each of

which shall be limited as far as practicable to a statement of a single set of circumstances. .

. ."  Fed. R. Civ. P. 10(b).  However, "[a]t base, the Rules command us never to exalt form

over substance."  Phillips, 408 F.3d at 128 (citing Fed. R. Civ. P. 8(f)).

The majority of defendants cite Abdul-Matiyn's failure to number his complaint in

paragraphs as a basis for dismissal.  However, the Court has been "willing to overlook

harmless violations of Rule 10(b) . . ." where the spirit of the rule, "to facilitate [] the clear

10

presentations of the matters set forth, so that allegations might easily be referenced in subsequent pleadings," is not offended.  Id. (citations and internal quotations omitted). Thus,  "where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted."  Id.  (citations omitted).

In this case, it is clear that all defendants were able to reference easily the allegations in the complaint as each set forth multiple reasons to dismiss the complaint other than the failure to comply with Rule 10(b).  Moreover, defendants were not clearly prejudiced as each motion and memorandum of law is extensively researched, cogently written, and, when viewed together, refute most of the bases upon which Abdul-Matiyn asserts constitutional violations.

Therefore, the motions of Walsh and Johnson, the State defendants, and the City defendants on this ground should be denied.

## C.  Personal Involvement

Certain defendants contend that Abdul-Matiyn has failed to establish their personal involvement.  "'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

11

> (1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

### 1. Walsh

Walsh contends that "[o]ther than being named in the caption and identified as a party, [he] is never referred to in the complaint."  Docket No. 17, Pt. 2 at 4.  However, construing all of Abdul-Matiyn's submissions liberally, he alleges that "Walsh . . . without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment . . . ."  Docket No. 48 at ¶ 11.  As discussed infra in subsection II(E)(2)(I), Abdul-Matiyn's involuntary civil confinement may constitute a due process violation.  Thus, Walsh's alleged actions of authoring and signing the allegedly false report which served as the basis of Abdul-Matiyn's confinement may constitute direct participation in an alleged constitutional violation.

Accordingly, Walsh's motion to dismiss on this ground should be denied.

### 2. Benbow, Allen, Rowe, and Valezquez

The City defendants contend that there are no allegations that they were personally

involved in the alleged deliberate indifference to Abdul-Matiyn's medical treatment because they were not personally involved with providing his medical care.  However, defendants need not physically administer the care to be subject to Eighth Amendment liability.

As discussed infra in subsection II(E)(1), construing all facts in the light most favorable to Abdul-Matiyn, the City defendants exhibited deliberate indifference to his medical treatment.  Although the City defendants were not responsible for the actual medical care, they were responsible for seeing that Abdul-Matiyn received adequate treatment once they were aware of his serious medical need.  Crediting Abdul-Matiyn's allegations, each City defendant ignored this responsibility by denying Abdul-Matiyn with medical treatment or severely delaying it.  Therefore, the complaint suffices to allege that each was directly involved in the alleged deliberate indifference.

Thus, City the City defendants' motion on this ground should be denied.


### 3. Sawyer

The State defendants argue that "[o]ther than being named in the caption and identified as a party, Sawyer is never referred to in the complaint."  Docket No. 47, Pt. 2 at 4. Reading all of Abdul-Matiyn's submissions together, he alleges that "superiors [are] liable for their [employees'] actions . . . and Sawyer is responsible for the training for those employed at CNYPC and liable for their actions and inactions."  Docket No. 48 at ¶ 22. Abdul-Matiyn continues by alleging negligent hiring and retention and vicarious liability.  Id. at ¶¶ 23-26.

Sawyer cannot be held liable solely because he held a supervisory position over other defendants.  Abdul-Matiyn does not specifically contend that Sawyer was directly involved

or had knowledge of the alleged constitutional violations; however, even when reading the complaint in the light most favorable to Abdul-Matiyn, any liberally construed allegations of direct involvement and knowledge would still lack any factual basis. Additionally, although Abdul-Matiyn contends that there was negligent supervision, there is no fact asserted beyond his conclusory allegations that Sawyer created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing the other named defendants.

Therefore, the State defendants' motion to dismiss on this ground should be granted.


## D. Severance

In the event of misjoinder of parties, "[a]ny claim against a party may be severed and proceed separately." Fed. R. Civ. P. 21. "While the decision whether to grant a severance motion is committed to the sound discretion of the trial court, the federal courts view severance as a procedural device to be employed only in exceptional circumstances." Baergas v. City of New York, No. 04-CV-2944 (BSJ/HBP), 2005 WL 2105550 at *3 (S.D.N.Y. Sept. 01, 2005) (citations and internal quotations omitted). The factors considered "when determining whether severance is appropriate [are]:

> (1) whether the claims arise out of the same transaction or occurrence, (2) whether the claims present common questions of fact or law, (3) whether severance would serve judicial economy, (4) prejudice to the parties caused by severance, and (5) whether the claims involve different witnesses and evidence."

Id. at *3-4 (citations omitted).

In this case, it is clear that severance is not warranted. The actions of Walsh and Johnson are the basis of Abdul-Matiyn's due process claim. Liberally reading all

14

submissions, Abdul-Matiyn alleges that Walsh, "without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment" and signed it, leading to Abdul-Matiyn's involuntary civil confinement, potentially in violation of the Fourteenth Amendment.  Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶ 11.  Additionally, Abdul-Matiyn contends that Johnson participated in the conspiracy to involuntarily confine him "by concealing what was taking place, and giving [him] misleading information concerning the situation."  Id. at ¶ 13.  Thus, the subsequent claims of involuntary confinement asserted against the CNYPC defendants directly relate to, and intertwine with, the allegations against Walsh and Johnson.  Additionally, the same set of facts relating to who signed the papers and ordered that he be confined would be determined in both cases. Among other things, this would result in defendants calling duplicate witnesses.  Thus, severing the litigation would not serve the interests of judicial economy and may lead to inconsistent findings in liability and damages which would prejudice all defendants.

    Therefore, Walsh and Johnson's motion to sever should be denied.


### E. Failure to State a Claim

    An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[], privilege[], or immunit[y] secured by the Constitution" or laws of the federal government.  42 U.S.C. § 1983.  Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right.  See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19 (1981).

## 1. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.  This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain."  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted).  A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66.  More than negligence is required "but less than conduct undertaken for the very purpose of causing harm."  Hathaway, 37 F.3d at 66.  The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need.  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer v. Brennan, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities,

and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. Id. at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a § 1983 claim." Magee v. Childs, No. 04-CV-1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

Courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." Nelson v. Rodas, No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002). Courts have also failed to recognize chest pains as a serious medical condition. See McCoy v. Goord, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (holding that keeping plaintiff "waiting for twenty-five minutes and then sen[ding] him back to his cell without treating his chest pains does not amount to a constitutional deprivation.").

17

However, considering Abdul-Matiyn's claims together and reading all allegations in a light most favorable to him, it appears that he has alleged a serious medical condition. Abdul-Matiyn contends he had a history of back pain and that the back pain he was experiencing on July 6, 2005 was so severe that it was "making it almost impossible to walk . . . ." Compl. at 7.  This pain began at 11:30 a.m. and was not addressed until after 3 p.m. Id. at 7-9. Additionally, the back pain was accompanied by severe chest pain.  Id. at 7.  This pain lasted far longer than that addressed in McCoy.  Additionally, the combination "had [Abdul-Matiyn] twisted over in a bending position . . . [causing him to] cry[]."  Id.  Crediting Abdul-Matiun's allegations, this combination of factors present a condition which a reasonable person or physician would deem worthy of treatment.  Additionally, the pain appears to have been of sufficient severity.  Thus, Abdul-Matiyn's chest and back pain constituted a serious medical condition.

Construing the allegations in the light most favorable to Abdul-Matiyn also leads to the conclusion that the City defendants were deliberately indifferent to his need for medical treatment.  Abdul-Matiyn alleges that Allen and Benbow refused to respond to his repeated requests to go to the clinic for his severe and crippling chest pains.  Compl. at 7. Additionally, even though Valezquez called the clinic on Abdul-Matiyn's behalf, it is alleged that Valezquez stood idly by while Benbow told the clinic that Abdul-Matiyn was to be placed "on the burn."  Id. at 8.  Additionally, upon arrival at the clinic, Rowe refused to let Abdul-Matiyn see a physician for an extended period of time.  Compl. at 9.  If proven, these actions could constituted intentional delay and denial of medical services during a serious medical need.

Therefore, the City defendants' motion to dismiss on this ground should be denied.

18

## 2. Fourteenth Amendment

### I. Due Process

Abdul-Matiyn contends that the State defendants violated his due process rights when he was involuntarily, civilly confined at CNYPC without being given any justification from the State defendants.  The State defendants contend that Abdul-Matiyn's claims are conclusory.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001).  "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." Malik v. Tanner, 697 F. Supp 1294, 1301 (S.D.N.Y. 1988) (citing Wolff v. McDonnell, 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." Fisk v. Letterman, 401 F. Supp. 2d 362, 374 (S.D.N.Y. 2005) (citing Addington v. Texas, 441 U.S. 418, 425 (1979)).  However, the Supreme Court has "permitt[ed] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the public." Kansas v. Hendricks, 521 U.S. 346, 371 (1997).  "In the case of civil confinement, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for . . . commit[ment] . . . [and is in]tolera[nt of] the involuntary confinement of a nondangerous individual." Mental Hygiene Legal Serv. v. Spitzer, No. 07-CV-2935 (GEL), 2007 WL 4115936, at *6 (S.D.N.Y. Nov. 16, 2007)

19

(citations and internal quotations omitted).

In this case, viewing all facts in the light most favorable to Abdul-Matiyn, it appears that his due process rights were violated.  Abdul-Matiyn continually inquired why he was being interviewed, if the results of those discussions would interfere with his release date, and, upon his arrival at CNYPC, under what authority and with what proof he was being detained.  All of these unanswered inquiries directly reflect upon the due process, or lack thereof, afforded to Abdul-Matiyn.

Additionally, construing the allegations in the light most favorable to Abdul-Matiyn, he was not a danger to the community as he had undergone multiple courses during his release and devoted his time and energy to his religion and assisting those less fortunate in the community.  Compl. at 13-14.  Moreover, Abdul-Matiyn had no suicidal ideations or mental illness but was merely a devout and spiritual Muslim.  Id. at 16.  Therefore, Abdul-Matiyn has alleged adequate facts to present a basis for recovery.

Thus, the State defendants' motion to dismiss on this ground should be denied.

### ii. Equal Protection[10]

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be

---

[10] Liberally construing Abdul-Matiyn's complaint, there is a second allegation of discrimination.  Abdul-Matiyn claims that defendants did not target those convicted of homicide, a crime specifically mentioned in the Mental Hygiene laws, for confinement while they did target sex offenders, a crime allegedly "never considered by the framers . . . as a mental illness . . . ."  Compl. at 25.  However, Abdul-Matiyn's conclusory allegations do not compare similarly situated individuals; thus, any such contention does not implicate Fourteenth Amendment protection.

treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

"In order to establish an equal protection violation, the plaintiffs must show that they were

treated differently than other people in similar circumstances and must establish that such

unequal treatment was the result of intentional and purposeful discrimination."  Myers v.

Barrett, No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.).  "To

withstand constitutional challenge, previous cases establish that classifications by gender

must serve important governmental objectives and must be substantially related to

achievement of those objectives."  Craig v. Boren, 429 U.S. 190, 197 (1976).

   In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in

CNYPC while similarly situated female sex offenders were not.  Compl. at 25.  Construing

all allegations in the light most favorable to Abdul-Matiyn, it appears that he has asserted a

sex-based, discriminatory policy.  The State defendants merely claim that Abdul-Matiyn has

stated a conclusory allegation; however, at this stage these facts, without any proffer of

substantial relation to an important government objective, are suffice to allege a potential

basis for relief.

   Therefore, the State defendants' motion to dismiss on this ground should be denied.


### 3. First Amendment

### I. Free Exercise of Religion

   Abdul-Matiyn alleges that his First Amendment rights were violated when the State

defendants failed to provide him with his religious meals and refused to let him pray.  The

State defendants contend that Abdul-Matiyn's claims are conclusory.

"The First Amendment . . . guarantees the right to the free exercise of religion."  <u>Johnson v. Guiffere</u>, No. 04-CV-57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007) (<u>citing</u> <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."  <u>Ford v. McGinnis</u>, 352 F.3d 582, 588 (2d Cir. 2003) (<u>citing</u> <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974)).   This right "is not absolute or unbridled, and is subject to valid penological concerns . . . ."  <u>Johnson</u>, 2007 WL 3046703, at * 4.

### a. Failure to Provide Halal Meals

The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet . . . ."  <u>Id.</u>  The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples . . . ."  <u>Ford</u>, 352 F.3d at 597 (citations omitted).  Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights."  <u>McEachin v. McGuinnis</u>, 357 F.3d 197, 203 (2d Cir. 2004).

> A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs. . . . [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision . . . [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under . . . <u>Turner</u> . . . .

<u>Johnson</u>, 2007 WL 3046703 at * 4-5 (citations omitted).

In this case, Abdul-Matiyn has articulated a First Amendment violation as the State defendants did not provide him with his halal meals during his confinement in CNYPC.  There is no dispute at this stage that Abdul-Matiyn held genuine religious beliefs.  The State

22

defendants at this stage assert only that Abdul-Matiyn's claim was conclusory.  Therefore, the State defendants' motion must be denied because the allegations of the complaint suffice to state a claim.

Therefore, the State defendants' motion on this ground should be denied.

### b. Refusal to Allow Prayer

"A determination of whether the refusal to permit attendance at a religious service [vioolates the First Amendment]  hinges upon the balancing of an inmate's First Amendment free exercise right[] against institutional needs of . . . operating prison facilities . . . ." Johnson, 2007 WL 3046703, at *4. "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) (citations omitted).

In this case, Abdul-Matiyn appears to have asserted a First Amendment violation when the State defendants removed his religious texts and refused to permit him to pray.  Compl. at 19.  Abdul-Matiyn specifically references defendant Capolo, alleging that "he refuse[d] to allow [Abdul-Matiyn] to go and perform his prayers . . . ." Id.  at 27.  The State defendants contend that Capolo's oral refusals constituted nothing more than verbal harassment, which "alone, unaccompanied by an injury no natter how inappropriate, unprofessional, or reprehensible . . , does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." Murray, 2007 WL 956941, at *8.

However, the State defendants are incorrect in asserting that Capolo's alleged oral denials amounted only to verbal harassment and were insufficient to state a First

Amendment violation.  Capolo's alleged continuous refusals to provide Abdul-Matiyn with his religious texts or permit him time and space to pray were at least arguably unreasonable in light of the fact that at this stage, the State defendants have not proffered a legitimate penological interest which justified denial of the provision of a book and time for prayer. Thus, Abdul-Matiyn has alleged here a violation with a potential basis for relief.

Therefore, the State defendants motion on this ground should be denied.


### ii. Access to Courts

Abdul-Matiyn contends that while confined, he was denied access to a law library and was thus denied his First Amendment right of access to the courts.  The State defendants assert that Abdul-Matiyn alleges only a conclusory claim here.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries . . . ."  Bounds v. Smith, 430 U.S. 817, 828 (1977); see also Lewis v. Casey, 518 U.S. 343, 351 (1996).  This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense."  Lewis, 518 U.S. at 531.  "[I]n order to fulfill the actual injury requirement . . . on a law library claim where there is a lack of access to the courts, the inmate must be pursuing [inter alia] . . . a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights."  Linares v. Mahunik, No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *7 (N.D.N.Y. Sept. 11, 2006) (citations and internal quotations omitted).  Thus, "to prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded

24

due to the actions of prison officials."  Id. (citations omitted).

In this case, Abdul-Matiyn enjoyed the right to a law library.  Construing his allegations in the light most favorable to Abdul-Matiyn, this right was violated when the State defendants denied him access to one.  Compl. at 20.  However, Abdul-Matiyn does not allege that he suffered any injury due to this alleged deprivation.  even when viewing all of Abdul-Matiyn's submissions together, he makes only that his lack of access to a law library precluded him from "drafting papers for court."  Docket No. 48 at § 47.  Additionally, Abdul-Matiyn claims that this preclusion from drafting papers provided defendants with their grounds for dismissal based on non-compliance with pleading requirements.  Id.

However, this conclusory allegation is insufficient to provide a basis for relief.  Abdul-Matiyn alleges no case then pending which was adversely affected in any way.  In this case, defendants' motions to dismiss based on the failure to comply with the pleading requirements were rejected.  Moreover, Abdul-Matiyn gives no other indication of what drafts he intended to submit to the Court.

Therefore, the State defendants' motion to dismiss on this ground should be granted.


### 4. Conspiracy

Johnson assert that Abdul-Matiyn has failed to state a cause of action against him. Abdul-Matiyn contends that Johnson participated in the conspiracy to have him civilly detained and that he has a right "to be free from conspiracies to deprive him of his constitutional rights."  Docket No. 48 at ¶¶ 13-14.

"Section 1985 prohibits conspiracies to interfere with civil rights."  Davila v. Secure Pharmacy Plus, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a claim for relief under

§ 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29 (1983); see also Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007).  "In addition, the conspiracy must be motivated by some class-based animus." Iqbal, 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn alleges that Johnson joined with others to deprive Abdul-Matiyn of his rights.  Liberally construing those allegations, the concert of actions by Johnson and others could support a claim of agreement among Johnson and other defendants and acts in furtherance of the conspiracy.  This suffices to support a claim for conspiracy against Johnson and Johnson's motion on this ground should be denied.

However, liberally construing Abdul-Matiyn's claims, he has asserted an action for negligent failure to prevent the deprivation of his rights.  If Johnson "ha[d] knowledge that any of the wrongs . . . mentioned in section 1985 . . . [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do . . . [he] shall be liable to the party injured." 42 U.S.C. § 1986.  However, "[a] claim under section 1986 . . . lies only if there is a viable conspiracy claim under section 1985." Gagliardi v. Vill. of Pawling, 18 F.3d 188, 194 (2d Cir. 1994).

Therefore, Johnson's motion to dismiss on this ground should be granted in part and denied in part.

**F. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S. at 100.

"[T]he Central New York Psychiatric Center[,] ... [as an institution, is an] arm[ ] of the state for Eleventh Amendment purposes and . . . therefore, [is] absolutely immune from [P]laintiff's claims for monetary damages in this lawsuit."  Murray v. Pataki, No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at *12 (N.D.N.Y. Mar. 29, 2007) (citations omitted).  Therefore, the motion of defendant CNYPC Medical Staff on this ground should be granted.


**III.  Conclusion**

For the reasons stated above, it is hereby **RECOMMENDED** that:

   A. The motion of Walsh and Johnson to sever (Docket No. 17) be **DENIED**;

   B. The motion of Walsh and Johnson to dismiss (Docket No. 17) be:

      1. **GRANTED** as to Abdul-Matiyan's conspiracy claim against defendant Johnson for failure to intervene; and

27

2. **DENIED** in all other respects;

C. The State defendants' motion to dismiss (Docket Nos. 44, 47) be:

1. **GRANTED** in all respects as to defendant Sawyer;

2. **GRANTED** in all respects as to Abdul-Matiyan's claim for denial of access to the courts; and

3. **DENIED** in all other respects;

D. The City defendants motion to dismiss (Docket No. 46) be **DENIED** in all respects;

E. The motion of defendant CNYPC Medical Staff to dismiss (Docket No. 55) be **GRANTED**; and

F. The complaint be **DISMISSED** without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  February 19, 2008
         Albany, New York

_David R. Homer_

United States Magistrate Judge