**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

FARIS ABDUL-MATIYN,

                                        Plaintiff,

           v.                                                          No. 06-CV-1503
                                                                          (GTS/DRH)

ALLEN, Correction Officer; ROWE, Correction
Officer; VALEZQUEZ, Correction Officer; BENBOW,
Correction Officer; JOHNSON, Sullivan
Correctional Facility Senior Parole Officer; WALSH,
Sullivan Correctional Facility Superintendent;
ELIZABETH FARNUM, Doctor; DEBROIZE, Doctor;
FORSHEE, Doctor; PETE HANMER, CNYPC
Primary Therapist; TOM MURPHY; JEFF NOWICKI;
SHARON BARBOZA, Director CNYPC SOTP
Program; STEVE CAPOLO; and LINDA BECKER,

                                        Defendants.

_____

**APPEARANCES:**                          **OF COUNSEL:**

FARIS ABDUL-MATIYN
Plaintiff Pro Se
Post Office Box 210130
Brooklyn, New York 11221

HON. MICHAEL A. CARDOZO              ELIZABETH A. WELLS, ESQ.
Corporation Counsel of the City of         Assistant Corporation Counsel
   New York
Attorney for City Defendants
Room 2-189
100 Church Street
New York 10007

HON. ANDREW M. CUOMO               CHRISTINA L. ROBERTS-RYBA, ESQ.
Attorney General for the                      Assistant Attorney General
   State of New York
Attorney for State Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, eleven DOCS employees ("State defendants") and four New York City Corrections Officers ("City defendants"),[2] violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments.  Compl. (Dkt. No. 1).  Presently pending are defendants' motions for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. Nos. 102, 107.  Abdul-Matiyn opposes both motions.  Dkt. Nos. 110, 113.  For the following reasons, it is recommended that the City defendants' motion be granted and the State defendants' motion be granted in part and denied in part.


**I. Background**

The facts are presented in the light most favorable to Abdul-Matiyn as the non-moving party.  See Ertman v. United States, 165 F.3d 204, 206 (2d Cir. 1999).


**A. City Defendants**

Abdul-Matiyn "was released from DOCS Woodburn [Correctional Facility], after . . . serv[ing] sixteen years and eight months . . . ."  Compl. at 13.  Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological

---

[1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2]Eleven other defendants were previously dismissed from the action.  Dkt. Nos. 8, 69.

programs . . . ."  Id.  On May 5, 2005, Abdul-Matiyn was arrested in New York City and

detained for a parole violation at Rikers Island, the principal detention facility for the City of

New York operated by the City's Department of Correction.  Id.

   Upon his arrival at Rikers Island, Abdul-Matiyn informed the medical staff that he

suffered from kidney and bladder stones,[3] chest pains, and chronic back pain.[4]  Dkt. No.

105-1 at 1-8.[5]  On July 6, 2005, while walking through the hallway, Abdul-Matiyn felt chest

pains commencing.  Dkt. No. 105-1 at 3.  As he approached the infirmary and while still in

the hallway, Abdul-Matiyn asked to be examined but was told to return to his unit and

request an appointment.  Dkt. No. 105-1 at 3.  Abdul-Matiyn told medical personnel that his

chest was becoming increasingly tight, it was difficult to breathe, and, coupled with his

chronic back pain, he was in agony.  Dkt. No. 105-1 at 3-4.  Abdul-Matiyn informed

defendants Allen and Benbow, corrections officers, of his pain.  Dkt. No. 105-1 at 85.

------

   [3] Abdul-Matiyn asserts that all defendants were aware that he was suffering from kidney and bladder stones but that no one responded until December 2006.  Abdul-Matiyn Aff. 1 ¶ 23; see also Dkt. No. 110 at 88-94.  Initial sonogram reports in June 2005 indicated that the stones were "bilateral [but] non-obstructive."  Dkt. Nos. 110 at 90, 113 at 23.  Abdul-Matiyn was seen by a specialist on June 10.  Dkt. Nos. 110 at 91, 113 at 28.  A surgical lithotripsy was performed December 13, 2006, to resolve the stones' presence, to which Abdul-Matiyn responded well, voicing only general discomfort.  Dkt. No. 110 at 94.  As a result of the surgery, "defendants left a stint inside [Abdul-Matiyn], which caused [him] extreme pain and bleeding, until after [he] was released and . . . ha[d] the stint removed."  Abdul-Matiyn Aff. 1 ¶ 24; Dkt. Nos 110 at 104-105, 113 at 31.  Abdul-Matiyn also attributes the lack of treatment to his high blood pressure and diabetes.  Abdul-Matiyn Aff. 2 (Dkt. No. 113 at 1-14) ¶¶ 9, 20-23.

   [4] According to Abdul-Matiyn, most of the diagnostic testing and treatment which he received for his chronic back pain occurred at Riker's Island.  Dkt. No. 105-1 at 7-8.

   [5] City defendants have included portions of Abdul-Matiyn's deposition transcript.  As the transcript is incomplete, citations will be made to the docket number and pagination located in the documents' headers.

3

Despite his continued complaints, crippling pain, and pleas to be taken to the hospital, Allen and Benbow ignored his requests.  Compl. at 7-8.  Allen then left for lunch, and defendant Valezquez, a corrections officer, reported for duty.  Dkt. No. 105-1 at 86.  Valezquez complied with Abdul-Matiyn's requests for medical attention, arranging transportation to the medical facility.  Compl. at 8.  However, Benbow discovered that Abdul-Matiyn was headed to the hospital and called the facility and told them to put him "on the burn."  Compl. at 8; Dkt. No. 105-1 at 5.

It took approximately three and a half to four hours for Abdul-Matiyn to be transported to the hospital.  Dkt. No. 105-1 at 5.  Once he arrived, Abdul-Matiyn spoke with defendant Rowe, a corrections oficer.  Dkt. No. 105-1 at 5; Compl. at 8.  Rowe did not let Abdul-Matiyn see a doctor until over three and one-half hours later.  Compl. at 9.  Abdul-Matiyn's chest pains had subsided, but he was still suffering from back pain and was prescribed methocarbamol. Compl. at 9; Dkt. No. 105-1 at 6.  The physician informed him that due to the hospital's faulty equipment, the methocarbarnol was the only treatment available and that any persisting pain would have to be managed with Abdul-Matiyn's ability to use his mind to control the discomfort. Compl. at 8.  Abdul-Matiyn had arthritis and back tenderness, presented with no signs of numbness or muscle atrophy, was prescribed pain medication to attempt to alleviate his symptoms, and was given referrals to specialists for therapy and further evaluation.  Dkt. No. 105-3 at 2.

The following day, on July 8, 2005, Abdul-Matiyn was seen by an orthopedist.  Dkt. No. 105-3 at 5.  The physician confirmed the presence of Abdul-Matiyn's chronic back pain, attributing it to a one-story fall which Abdul-Matiyn suffered in 1969.  Id.  The physician performed a battery of tests, concluding that Abdul-Matiyn had osteoarthritis in his knees

and a tenderness throughout his spine.  Id.

Throughout Abdul-Matiyn's five-month stay at Rikers, he was treated on multiple occasions: May 11; June 9, 10, 13, 16, 27, and 29; July 6, 8, 11, 14, 18, 21, 25, and 28; August 10, 16, and 23; and September 1 and 9, 2005.  Dkt. No. 105-2.  On May 11, 2005, a chest x-ray showed normal results, with no indications of "pulmonary infiltrate or mass [and n]o pleural effusion . . . ." and back x-rays confirmed mild disc space narrowing in his lower spine.  Dkt. No. 105-3 at 3.   However, Abdul-Matiyn also stated that he would attempt to seek treatment without apprising Allen or Benbow, and on four or five occasions when Allen and Benbow discovered Abdul-Matiyn's plan, they terminated his examinations and had him sent back to his cell.  Dkt. No. 105-1 at 10.

Despite Abdul-Matiyn's dissatisfaction with the medical care he received, he never filed a grievance during his time at Riker's Island.  DiCarlo Decl. (Dkt. No. 105-4) ¶¶ 5, 7-8. Abdul-Matiyn was aware of the procedure for filing a grievance and that he could file letters of complaint with the superintendents.  Dkt. No. 107-7 at 3.[6]  Abdul-Matiyn acknowledged that the staff at Rikers Island directed him to file grievances.  Dkt. No. 107-7 at 3.


### B. State Defendants

On September 16, 2005, Abdul-Matiyn was transferred from Riker's Island to DOCS Sullivan Correctional Facility ("Sullivan").  Dkt. Nos. 105-2 at 1, 107-7 at 6.

---

[6]  State defendants have also included portions of Abdul-Matiyn's deposition transcript.  As the transcript is incomplete, citations will be made to the docket number and CM/ECF pagination located on the headers of the documents.

**1. Involuntary Commitment at CNYPC**

"At some point shortly before [Abdul-Matiyn's] release from Sullivan . . . [defendant Walsh] was advised that there were concerns about his mental health and that medical staff believed he may need to be committed to a psychiatric hospital."  Walsh Decl. (Dkt. No. 107-2) ¶ 7.  On April 28, 2006, Abdul-Matiyn was examined by Drs. Reddy and Bernstien. Walsh Decl. ¶ 8; Dkt. Nos. 107-3, 107-4, 110 at 66-69.  During that evaluation Abdul-Matiyn expressed his concern that something was going to preclude him from being released on parole.  Dkt. No. 110 at 72.  Such concerns were not further addressed with him by State defendants.  Abdul-Matyin Aff. 1 ¶ 16

Abdul-Matiyn had an extensive and varied criminal history, but has refused to accept responsibility for his most recent sexual offense conviction.  Dkt. No. 110 at 72. Additionally, Abdul-Matiyn fully admitted to hearing, and occasionally seeing, spirits which gave him directions.  Docket No. 110 at 72.  These spirits could not be seen by others and, according to Abdul-Matiyn, he did not require medication.[7]  Dkt. No. 110 at 72.  Abdul-Matiyn states that these spirits led him in positive ways, but his history indicated that, as a teenager, he was hospitalized after these spirits instructed him to threaten suicide.  Dkt. No. 110 at 72, 73.  Abdul-Matiyn has a history of alcohol dependence and substance use.  Dkt. No. 110 at 72.  During the interview, Abdul-Matiyn was alert, calm and cooperative, denied any suicidal or homicidal ideations, had a grossly intact memory, normal speech, coherent thought process, and poor judgment and insight into his illness.  Id. at 73.  When asked what his future plans were, Abdul-Matiyn stated that he did not want to work, did not care to

---

[7] Abdul-Matiyn has also refused medication because he does not want to gain any weight.  Dkt. No. 110 at 73.

6

be around people, and wanted to marry his girlfriend, though he claimed not to have spoken with her recently.  Id. at 74.  Abdul-Matiyn "need[ed] further evaluation and ongoing treatment for his psychiatric problems including his alcohol dependence.  Given his prior sexual offenses, he needs further evaluation and treatment for these problems also."  Id. at 73.

The resulting  recommendations certified that Abdul-Matiyn was a potential danger to himself and the community and required further treatment.  Walsh Decl. ¶¶ 8-9.  the recommendations rested on Abdul-Matiyn's "history of psychiatric problems, including a diagnosis of Schizoaffective Disorder,[8] a failure to comply with medication orders, and his admission that he was hearing voices and taking direction from them."  Id.; see also Dkt. Nos. 107-3, 107-4, 110 at 66-69.  Upon the two physicians' recommendations, defendant Walsh, the Sullivan Superintendent, signed an application for involuntary admission for mental health evaluation.  Walsh Decl. ¶¶ 10, 12; Dkt. Nos. 107-5, 110 at 65.  When Abdul-Matyin asked the examining physicians why they were there, and what the point of the evaluation was, they did not inform him "of their intent to hospitalize [him] . . . nor did they mention that they were seeing [Abdul-Matiyn] due to any sexual offense history."  Abdul-Matyin Aff. 1 ¶ 16.

On May 4, 2006, as Abdul-Matiyn approached his parole release date, it was

---

[8] Schizoaffective disorder features "a Major Depressive, Manic, or Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia[,] ... delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms[,] ... and [t]he symptoms must not be due to the direct physiological effects of a substance (e.g., cocaine) or a general medical condition." DSM-IV-TR at 319. The symptoms "may occur in a variety of temporal patterns." Id. at 320.

determined that he would be paroled to Central New York Psychiatric Center (CNYPC). Dkt. No. 110 at 70-71.  On May 5, 2006, Abdul-Matiyn was met by defendant Johnson, a parole officer at Sullivan, and informed that he was "suppose[d] to have been examined by mental health the last two weeks before he was to be released [and] . . . he had to be transferred to Marcy Psychiatric to be evaluated."  Compl. at 18; see also Dkt. No. 107-7 at 6.  Abdul-Matiyn was told that his evaluation would be "three days to a week and no more than two weeks . . . ."  Id.  Abdul-Matiyn was then strip-searched, shackled, and transported to CNYPC.  Id.; Dkt. No. 107-7 at 7-8.

Abdul-Matiyn reported to the gymnasium shortly after his arrival at CNYPC.  Dkt. No. 107-8 at 2.  Abdul-Matiyn "was upset in being here and not told of in advance."  Id.  On May 8, 2006, a CNYPC Sex Offender Treatment Program ("SOTP") admission packet was completed for Abdul-Matiyn, noting a diagnosis of schizoaffective disorder and stating his "evaluat[ion] for hospitalization at CNYPC SOTP [was] due to the nature of his past crime which involved the rape and sodomy of a [ten] year old girl in 1983."  Dkt. No. 110 at 86.  Thus, it appears Abdul-Matiyn's involuntary confinement was two-fold, addressing both psychological disorders and his sexual misconduct convictions.

### 2. Strip Search

Abdul-Matiyn also contends that while he was at CNYPC, he was forcibly strip-searched several times and threatened with the injection of drugs if he refused to be searches or to participate in the CNYPC programs "even if his refusal [wa]s due to his religion or if he w[as] physically ill."  Compl. at 23; Abdul-Matiyn Aff. 1 ¶ 25.  On January 10, 2007, a small fire started in the bathroom of the ward in which Abdul-Matiyn was living.  Dkt. No. 110 at 77.  A

8

"[d]ecision was made to order strip searches on all patients due to severity of this safety issue." Id.  Abdul-Matiyn was apprised of the searches and why they were being conducted, and was then "moved to a private area and [a] search was conducted by male staff." Id.  Abdul-Matiyn's room was then searched, during which he remained cooperative, and some medical equipment was taken and placed within the care of the nurse.  Id.  Later that evening, Abdul-Matiyn requested to speak to the physician that wrote the order for the strip searches, claiming he felt "violated that [he] was searched." Id. at 76.  The physician, defendant Nowicki, and a registered nurse "reassured [Abdul-Matiyn that the search] was done for safety and security reasons." Id.  Abdul-Matiyn thanked these individuals for the further reassurance and explanation.  Id.  Abdul-Matiyn denies that this never occurred.  Abdul-Matiyn Aff. 1 ¶ 25.

### 3. Religious Interference

### i. Halal Diet[9]

Upon arrival at CNYPC, Abdul-Matiyn notified staff that he was Muslim and staff ordered him a pork-free diet.  Dkt. No. 107-8 at 2.  According to Abdul-Matiyn, however, he did not eat for the first several days at CNYPC because all defendants were serving was pork products.  Dkt. No. 107-7 at 12.  On May 7, 2006, Abdul-Matiyn stated to staff that "he w[ill not] eat the food as it has not been blessed by Imam."  Dkt. No. 107-8 at 3.  Abdul-Matiyn requested halal meals, a request which CNYPC could not accommodate because they "do not have halal foods, [and instead it]. . . offer[s] a pork free diet for [the] Muslim patients."

---

[9] "Halal" foods are those prepared in accordance with Islamic religious law. See, e.g., Cyril Glasse, The Concise Encyclopedia of Islam 133, 144, 148 (1989).

Id.  Staff offered Abdul-Matiyn the choice of a kosher diet, but he declined as his religion mandated halal foods.[10]  Dkt. No. 107-7 at 13; Brobam Aff. (Dkt. No. 110 at 16-28) ¶¶ 35-49.  Abdul-Matiyn also contends that defendant Becker indicated that she would attempt to provide Abdul-Matiyn with a halal diet, though she never fulfilled her promise.  Dkt. No. 107-7 at 15; Abdul-Matiyn Aff. 1 ¶ 20.  Staff reported that Abdul-Matiyn had eaten meals two days prior, when he arrived at the facility, supper the day before, and breakfast on May 7th.  Dkt. No. 107-8 at 3, 4.  A nutrition assessment was ordered, as was a request for the Imam to speak with Abdul-Matiyn.  Id.  That day, the dietician met with Abdul-Matiyn, had his pork-free diet terminated, and instituted a vegetarian diet.  Dkt. No. 107-8 at 4, 5-9.  That evening, Abdul-Matiyn ate dinner.  Id.  The dietician also referred Abdul-Matiyn to meet with the Imam, which was scheduled for the following day.  Id.

Abdul-Matiyn ate fish the majority of the time at CNYPC, which is halal food.  Dkt. No. 107-7 at 11.  The fish was Abdul-Matiyn's, personally, and was supplied to him either via package or purchased through the commissary.  Id. at 11, 13.  Abdul-Matiyn began receiving such packages "[a]lmost immediately after" arriving at CNYPC.  Id. at 13.  CNYPC staff kept Abdul-Matiyn's religious food in the kitchen and prepared it for him to eat.  Id.  Hence, after his packages started arriving, almost immediately after his arrival, Abdul-Matiyn began receiving what he deemed as religiously appropriate meals.  Id. at 13-14.[11]

---

[10] "Kosher meat is prepared in a way that satisfies all the requirements of Halal meat.  Hence, Kosher meat is Halal, even though Halal meat is not necessarily Kosher."  Perez v. Westchester County Dep't of Corr., 587 F.3d 143, 144 n.1 (2d Cir. 2009).  Thus, despite Abdul-Matiyn's protests, a kosher diet, like a vegetarian diet, is an adequate substitute though, as discussed infra, it may be more restrictive.

[11] Abdul-Matiyn's submissions contradict his previous testimony, indicating that he "was not allowed to receive food packages until a few months after arriving at CNYPC.

**ii. Prayer**[12]

Abdul-Matiyn also alleges that the CNYPC defendants, "especially . . . Hanmer, . . Murphy, . . Nowicki and . . . Payne told [him] he had no constitutional rights . . . to be allowed to . . . ." participate in prayer.  Compl. at 20.  Abdul-Matiyn contends that state defendants refused to let him initiate and participate in the Juma'h prayer.  Dkt. No. 107-7 at 9; see also Brabam Aff. ¶¶ 57-61 (explaining the importance of Friday, or Juma'h, prayers and prayer services).  However, when that opportunity was denied, Abdul-Matiyn commenced the Zhur prayer.  Dkt. No. 107-7 at 9.  Abdul-Matiyn prayed "[w]herever [defendants] allowed [him to] and when they allowed [him to].  The times that [defendants] didn't allow [Abdul-Matiyn the chance to pray, he] had to forfeit it."  Id.

**5. Conditions of Confinement**

For the first four or five months at CNYPC, no one cleaned Abdul-Matiyn's room and he was forbidden from doing so.  Dkt. No. 107-7 at 15-16.  The bathrooms were filthy and infested with bugs.  Id.  While the inmates continued to complain to state defendants, they were told that they did not deserve better conditions.  Id. at 16-17.  One maintenance person was assigned to clean Abdul-Matiyn's floor, but he did not like to clean it because "[h]e didn't want to be around individuals that had the conviction that we had there."  Id. at 16.

———————————

Abdul-Matiyn Aff. 1 ¶ 20.

[12] State defendants concede that a material issue of fact remains as to whether defendant Capolo interfered with Abdul-Matiyn's First Amendment right to practice his religion.

11

## II. Discussion[13]

In his complaint, Abdul-Matiyn alleges that his First Amendment rights were violated because the State defendants failed to provide him with halal meals and did not allow him to pray.  Abdul-Matiyn also claims that his Fourth Amendment rights were violated when he was unlawfully strip-searched.  Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to in delaying his ability to obtain medical assistance. Moreover, Abdul-Matiyn contends that his due process rights were violated by his civil confinement, conditions of confinement, and transport in restraints; as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders.  City defendants move for summary judgment on the grounds that(1) Abdul-Matiyn failed to exhaust his administrative remedies, (2) there is no merit to his constitutional claims, and (3) defendants are entitled to qualified immunity.  State defendants move for summary judgment on the grounds that (1) Abdul-Matiyn's due process claims are barred, (2) there is no merit to his constitutional claims, and (3) defendants are entitled to qualified immunity.

---

[13] All defendants contend that Abdul-Matiyn failed to comply with the local rules as he did not file a Material Statement of Facts to controvert that which defendants' have asserted.  Dkt. Nos. 112, 115.  However, from the documents submitted, the controverted facts were determinable without Abdul-Matiyn's statement of facts.  Thus, defendants' requests to have their facts deemed admitted should be denied.  Abdul-Matiyn is instructed to follow the local rules in any subsequent submissions.  Additionally, Abdul-Matiyn claims not to have received City defendants' motion for summary judgment.  Dkt. No. 120.  However, Abdul-Matiyn timely responded to the motion.  Thus, such claim, even if true, was not prejudicial here and As such, Abdul-Matiyn's request for the Court to ignore City defendants' motion is denied.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some

13

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477

U.S. at 247-48.


## B. Failure to Exhaust

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies

prior to bringing any suits challenging prison conditions, including federal civil rights cases.

Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 83

(2006).  This exhaustion requirement applies to all prison condition claims.  Porter, 534 U.S.

at 532.  "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall

confinement is necessarily a condition of that confinement."  Jenkins v. Haubert, 179 F.3d

19, 28 (2d Cir. 1999). The exhaustion requirement also applies even if the administrative

grievance process does not provide for all the relief requested by the inmate.  Nussle, 534

U.S. at 524.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has

recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170, 175

(2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)).  Exhaustion for an

inmate in DOCS custody is generally achieved through the Inmate Grievance Program

(IGP).[14]  See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1 et seq..  However, when inmates

---

[14]"The IGP is a three-step process that requires an inmate to: (1) file a grievance
with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent
within four working days of receiving the IGRC's written response, and (3) appeal to the
CORC [Central Office Review Committee] ... within four working days of receipt of the
superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004)
(internal citations omitted).

14

fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is

fatal to their claims.  A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants
> have either waived the defense of failure to exhaust or acted in such a way as
> to estop them from raising the defense; or (3) special circumstances, such as
> a reasonable misunderstanding of the grievance procedures, justify the
> prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

Administrative remedies are unavailable when there is no "possibility of [] relief for the

action complained of." Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (citing Booth v.

Churner, 532 U.S. 731, 738 (2001)).  The test to determine the availability of an

administrative remedy is an objective one asking whether "a similarly situated individual of

ordinary firmness" would have deemed it accessible.  Id. at 688.  Courts have found

unavailability "where plaintiff is unaware of the grievance procedures or did not understand

it or where defendants' behavior prevents plaintiff from seeking administrative remedies."

Hargrove v. Riley, No. CV-04-4587 (DST), 2007 WL 389003, at *8 (E.D.N.Y. 2007) (internal

citations omitted).

Here, Abdul-Matiyn commenced his lawsuit in December 2006, while housed as a

parolee at CNYPC concerning events which occurred at both Rikers Island and CNYPC.

Dkt. No. 110 at 70-71.  Abdul-Matiyn asserts that filing his complaint as a parolee exempted

him from the exhaustion requirements of the PLRA as he was not "a prisoner confined in

any jail, prison or correctional facility . . . when he filed his action."  Abdul-Matiyn Aff. 2 ¶¶ 5-

6.  Such contentions are correct.  Greig v. Goord, 169 F.3d 165, 167 (2d Cir. 1999); Cox v.

Malone, 199 F. Supp. 2d 135, 139-40 (S.D.N.Y. 2002) (explaining Greig holding as

applicable to the "procedural requirement requiring prisoners to fully exhaust their claims

15

within the prison system before bringing a federal action."). Thus, exhaustion was not required to litigate the present claims.

Accordingly, City defendants' motion on this ground should be denied.


### C. First Amendment

Abdul-Matiyn alleges that his First Amendment rights were violated when the State defendants failed to provide him with his religious meals and refused to let him pray while he was involuntarily confined. The State defendants contend that Abdul-Matiyn's claims are unsupported and insufficient.

The First Amendment protects the right to free exercise of religion. See generally Cutter v. Wilkinson, 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citing Pell v. Procunier, 417 U.S. 817, 822 (1974)). This right is not absolute and can be limited due to the inmate's "incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citations omitted); see also Benjamin v. Coughlin, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard is one of reasonableness, taking into account whether the particular regulation . . . is reasonably related to legitimate penological interests.") (citations omitted).

> The Turner Court determined that the four factors to be considered
> are considered: 1) whether there is a rational relationship between
> the regulation and the legitimate government interests asserted; 2)
> whether the inmates have alternative means to exercise the right;
> 3) the impact that accommodation of the right will have on the

16

prison system; and 4) whether ready alternatives exist which
accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

In this case, Abdul-Matiyn was not a prisoner during his time at CNYPC but a parolee

who was involuntarily confined.  Civilly committed persons retain certain First Amendment

rights and "are entitled to more considerate treatment and conditions of confinement than

criminals whose conditions of confinement are designed to punish."  Youngberg v. Romeo,

457 U.S. 305, 321-22 (1982).  When considering a First Amendment violation alleged by an

involuntarily confined individual, other courts have deemed the Turner factors appropriate in

evaluating such claims.  See Hydrick v. Hunter, 449 F.3d 978, 994-995 (9th Cir. 2006)

(using Turner to support the proposition that, "[a]s is the case with prisoners, civilly

committed persons certainly retain those First Amendment rights not inherently inconsistent

with the circumstances of their detention.");  Thompson v. Vilsack, 328 F. Supp. 2d 974,

977-980 (S.D. Iowa 2004) (using Turner to determine appropriateness of policy to have

those involuntarily confined co pay for their religious meals).  Turner thus guides the

analysis here.


### 1. Failure to Provide Halal Meals[15]

The Second Circuit has held "that prison authorities must accommodate the right of

prisoners to receive diets consistent with their religious scruples."  Kahane v. Carlson, 527

F.2d 492, 495 (2d Cir. 1975).  Therefore, to "deny prison inmates the provision of food that

---

[15] Defendants do not dispute that Abdul-Matiyn's religious beliefs are sincerely held.

17

satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights."
McEachin v. McGuinnis, 357 F.3d 197, 203 (2d Cir. 2004).  The same holds for those
involuntarily confined.  "Courts, however, are reluctant to grant dietary requests where the
cost is prohibitive, or the accommodation is administratively unfeasible."  Benjamin, 905
F.2d at 579.

In this case, Abdul-Matiyn contends that State defendants failure specifically to order
him halal meals represented a First Amendment violation.  The records indicate the
defendants did not provide inmates with halal meals but instead provided them a choice of
either pork-free or vegetarian meals, both of which comply with the demands of halal food.
Dkt. No. 107-8 at 3.  However, State defendants have failed to articulate the first Turner
standard as to the legitimate penological interest which is rationally related to their refusal to
provide halal meals.  This makes summary judgment inappropriate.  See Francis v. Keane,
888 F. Supp. 568, 577 (S.D.N.Y. 1955) (denying summary judgement where "grave
questions remain with respect to the nexus, if any, between applying the directive to the
plaintiffs and defendants' asserted penological interests . . . . ") (citing cases).[16]

However, state defendants argue that whatever deprivation Abdul-Matiyn suffered was
de minimis, and not actionable.  While not specified in the Turner factors, Second Circuit
case law regarding inmate free exercise claims incorporates a "threshold [showing] that the
disputed conduct substantially burdens his sincerely religious beliefs."  Salahuddin, 467
F.3d at 274-75 (citing Ford, 352 F.3d at 591).  While state defendants' have failed in their
"relatively limited burden or identifying the legitimate penological interests that justify the

---

[16] This conclusion remains even thought Abdul-Matiyn was provided reasonable
alternatives.

18

impinging conduct," such a failure is not fatal to their motion because Abdul-Matiyn has

failed to allege or prove more than an inconsequential burden on his religious rights.

Salahuddin, 467 F.3d at 275 (citations omitted).

   Abdul-Matiyn's conclusory claims that he was not provided appropriate halal food for

months is contradicted by his own testimony and the record.  Such conclusory claims are

insufficient to support a motion for summary judgment, and belied by the testimony and

treatment notes included in the record.[17]  Abdul-Matiyn's submissions claim that he did not

receive packages of food for months, though his own deposition testimony indicates that he

missed meals for only the first three days and that his packages were available "almost

immediately after" his arrival at CNYPC.  Dkt. No. 107-7 at 12-13.  Abdul-Matiyn's

submissions are also belied by the record which indicates that Abdul-Matiyn ate multiple

meals on May 5, dinner on May 6, and breakfast on May 7.  Dkt. No. 107-8 at 3, 4.  Even

crediting Abdul-Matiyn's deposition testimony indicating that he did not eat any meals for

the first three days he was at CNYPC, such allegations are still insufficient to support a First

Amendment claim.  See McEachin v. McGuinnis, 357 F.3d 197, 203 n.6 (2d Cir. 2004)

(holding that, "[t]here may be inconveniences so trivial that they are most properly ignored .

. . [thus] the time-honored maxim *de minimis non curat lex*[18] applies."); see also Rapier v.

Harris, 172 F.3d 999, 1006 n.6 (7th Cir. 1999) ("De minimis burdens on the free exercise of

---

[17] In Kelsey v. County of Schoharie, the opinion confirmed that the judges
considered the facts in the light most favorable to the plaintiff, but were mindful not to
credit the plaintiff's overstatement of facts which were otherwise fairly presented by other
testimony and evidence within the record.  567 F.3d 54, 63 n.2 (2d Cir. 2009).

[18]This phrase translates as "the law does not concern itself with trifles."  Gottlieb
Dev. LLC v. Paramount Pictures Corp., 590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008).

religion are not of constitutional dimension.").  Missing a few days of regularly scheduled meals constitutes such a *de minimus* intrusion.   See <u>Ford v. McGinnis</u>, 352 F.3d 582, 594 n.12 (2d Cir. 2003) (holding that a meal associated with a large religious feast "is unique in its importance within [the religion] to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a de minimis burden) (citations omitted); <u>Rapier v. Harris</u>, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (affirming summary judgment because "the unavailability of a non-pork tray . . . at three meals out of 810 does not constitute more than a de minimis burden . . . [as there] has [been] no[] alleg[ation of] a routine or blanket practice of denying him pork-free meals."); <u>Evans v. Albany County Corr. Facility</u>, No. 05-CV-1400, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (holding that providing one wrong meal a week for approximately eighteen weeks was *de minimis*).  Accordingly, viewing the evidence in the light most favorable to Abdul-Matiyn, he has still alleged only a *de minimus* burden on his religious exercise which is insufficient to state a First Amendment claim.

Thus, the State defendants' motion on this ground should be granted.

### 2. Prayer

""[P]risoners have a constitutional right to participate in congregate religious services." <u>Salahuddin</u>, 993 F.2d at 308.  While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services,

whenever possible." Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989) (citations

omitted).   "The governing standard is one of reasonableness, taking into account whether

the particular regulation affecting some constitutional right asserted by a prisoner is

reasonably related to legitimate penological interests." Benjamin v. Coughlin, 905 F.2d 571,

574 (2d Cir. 1990) (citations omitted).  The same analysis is undertaken when there is an

allegation that "an individual dec[ided] to deny a prisoner the ability to engage in some

requested religious practice."  Ford, 352 F.3d at 595 n.15 (citations omitted).  This

reasonableness standard has also been applied in involuntary commitment cases.

Youngberg, 457 U.S. at 322.

    State defendants assert that Abdul-Matiyn's complaints about Hanmer, Murphy, and

Nowicki are insufficient because they fail to "contain some specific allegations of fact

indicating a deprivation of rights."  Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987).

Conversely, Abdul-Matiyn testified that State defendants prohibited him from engaging in

Juma'h prayers, but sporadically allowed him to conduct Zhur prayers when they deemed it

was appropriate. Dkt. No. 107-7 at 9.  Similar to the situation in Young v. Coughlin, State

defendants have primarily argued that such testimony was conclusory and failed to state a

claim, failing to "set forth any specific reasons in an affidavit or otherwise for their decision

to restrict [Abdul-Matiyn's] exercise of his first amendment rights" by participating in both the

Juma'h and Zhur prayers.  Young, 866 F.2d at 569.  While the district court in Young

agreed with the government, and inferred that the inability to participate in prayer services

was due to a reasonably instituted disciplinary confinement, the Second Circuit reversed

holding that the inmate's claims were not conclusory.  Id. at 569-70.

    The same is true in this case.  Abdul-Matiyn has provided his own affidavit and that of a

spiritual leader detailing the importance of these two prayers.  Moreover, while lacking in the details of when, where, and how many times Abdul-Matiyn was deprived of his right to pray, his allegations do state that such deprivations sporadically occurred, and defendants have "made no effort to justify their restriction of [Abdul-Matiyn's] free exercise rights . . . [thus] there were not entitled to summary judgment as a matter of law. . . ."  Id. at 570 (citations omitted).

Accordingly, State defendants' motion on this ground should be denied as to Hanmer, Murphy and Nowicki and granted as to all other State defendants.


### D. Strip-Search

The Fourth Amendment protects the rights of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  Generally, searches and seizures may be conducted if there exists probable cause to believe that a crime has been committed and that evidence of that crime is present on the person or premises to be searched.  Id.

Other circuit courts have found that the proper standard in such a situation with an individual involuntarily committed is that "usually applied to excessive-force claims brought by pretrial detainees."  Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009) (citations omitted).  Using the test articulated in Bell v. Wolfish, the Eighth Circuit determined "a balancing of the need for the particular search against the invasion of personal rights that the search entails," was appropriate paying special consideration to "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and

the place in which it is conducted." Serna, 567 F.3d at 949 (citing Bell, 441 U.S. at 559).

Additionally, after applying a similar test which balanced an individual's expectation of

privacy and the governmental interest, this district has held that, in the case of a patient

who was voluntarily admitted in a psychiatric center, "that a strip search . . . without

individualized suspicion to believe that the admittee possessed . . . [a] weapon, violated the

searchee's Fourth Amendment rights." Aiken v. Nixon, 236 F. Supp. 2d 211, 236 (N.D.N.Y.

2002), aff'd, 80 Fed.Appx. 146 (2d Cir. 2003).  Moreover, "a strip search or body cavity

search to discover stolen property that does not consist of drugs, weapons or other

contraband that could pose a threat of harm to the searchees, other patients, or staff was

constitutionally impermissible."  Id.

   Abdul-Matiyn contends that he was repeatedly strip-searched at CNYPC.  Silent as to

material details, these conclusory allegations are insufficient to withstand a motion for

summary judgment.  However, Abdul-Matiyn does offer evidence of a singular strip frisk.

Dkt. No. 110 at 76-77.  In that instance, someone from Abdul-Matiyn's ward brought

matches into the bathroom and started a fire.  Id.  This action represented a threat to

residents and workers alike.  However, as in Aiken, the State defendants have offered no

particularized basis for believing that Abdul-Matiyn possessed the matches on his person

and, instead, proceeded to search him, and other residents in a generalized search for the

matches.  A strip-search in these circumstances required more than such a generalized

suspicion.

   Not all State defendants were involved in the strip-search. however.  It appears that

Nowicki and Barbozza participated in the decision to conduct the stip searches of patients

but no evidence has been proffered of the involvement of any other defendant.  See Docket

No. 110 at 77.  Accordingly, State defendants' motion on this ground should be denied as to Nowicki and Barbozza and granted as to all other State defendants.

### E. Fourteenth Amendment

### 1. Involuntary Commitment

Abdul-Matiyn contends that his due process rights were infringed when he was involuntarily committed to CNYPC upon the cessation of his prison term and beginning of his parole.  It appears that the basis for Abdul-Matiyn's involuntary confinement was two-fold, addressing both psychological disorders and his sexual misconduct convictions.  State defendants' contend such challenges are barred by the favorable termination rule in Heck v. Humphrey, 512 U.S. 477, 487-87 (1994).

A federal court has jurisdiction to consider an "application for a writ of habeas corpus in behalf of a person in custody . . . [where such] custody [is] in violation of the Constitution . . . of the United States."  28 U.S.C. § 2254(a).  An individual seeking release from involuntary confinement in a mental institution is "in custody" and, thus, habeas relief is available and appropriate for such situations.  See Duncan v. Walker, 533 U.S. 167, 176 (2001) (explaining that a habeas petition may be available to individuals in custody pursuant to civil commitment); Huftile v. Miccio-Fonseca, 410 F.3d 1136, 1139 (9th Cir. 2005) ("It is well established that detainees under an involuntary commitment scheme . . . may use a § 2254 habeas petition to challenge a term of confinement."); Buthy v. Comm. of Office of Mental Health of New York State, 818 F.2d 1046, 1051-51 (2d Cir. 1987) (holding that habeas corpus was the correct vehicle within which to dispute involuntary commitment) (citations

omitted); <u>Souder v. McGuire</u>, 516 F.2d 820, 823 (3d Cir. 1975) ("There is no question about
the appropriateness of habeas corpus as a method of challenging involuntary commitment
to a mental institution.") (citations omitted); <u>Sarzen v. Gaughan</u>, 489 F.2d 1076, 1081-82
(1st Cir. 1973) (discussing procedural course of involuntary commitment case which utilized
a habeas petition to challenge the commitment).  There is little difference between the
constraints on personal liberty in the case of criminal confinement and that in civil
commitment as both compel an individual to debilitating and isolated living conditions,
which, if imposed unconstitutionally, are extremely offensive to notions of justice,
fundamental fairness, and the right to be free from restraint.  <u>See</u> <u>Peyton v. Rowe</u>, 391 U.S.
54, 66 (1968) (explaining that the habeas writ is "not now and never has been a static,
narrow, formalistic remedy; its scope has grown to achieve its grand purpose – the
protection of individuals against erosion of their right to be free from wrongful restraints
upon their liberty.").

    However, when available, habeas is the sole possible remedy, excluding all other forms
of relief that "would necessarily imply the invalidity of his conviction or sentence," unless a
plaintiff proves that the conviction or sentence has been reversed on direct appeal or
declared invalid.  <u>Heck</u>, 512 U.S. at 477, 480-81, 486-87 (1994).  Such preclusion applies to
procedural challenges, where the nature of the challenge would necessarily imply the
invalidity of the underlying confinement.  <u>Edwards v. Balisok</u>, 520 U.S. 641, 646-649 (1997).
The law under which Abdul-Matiyn was committed would authorize commitment "upon the
certificates of two examining physicians, accompanied by an application for the admission
of such person."  N.Y. Men. Hyg. Law § 9.27(a).  By challenging the actions of Walsh, the
individual responsible for submitting the application for admission, Abdul-Matiyn, if

successful, would invalidate his commitment since the application would be deemed unlawful.  See Huftile, 410 F.3d at 1141 (finding that, by invalidating one of two evaluations necessary for a proper commitment, plaintiff would necessarily be invalidating his commitment).

Accordingly, the favorable termination rule precludes the current claim unless there has been a reversal or declaration of invalidity.  The record contains neither.  Therefore, defendants' motion as to this claim should be granted.


**2. Restraints During Transport**

It is well established that freedom from bodily restraint is a cornerstone of the guarantees provided by the Due Process Clause.  Youngberg, 457 U.S. at 316.  "Yet these interests are not absolute . . . [and] there are occasions in which it is necessary for the State to restrain the movement of residents . . . to protect them as well as others from violence." Id. at 320.  A balancing test between the individual's interest in his or her liberty and the State's reason for utilizing restraints is necessary, and if the use of restraints are "reasonably related to legitimate government objectives and not tantamount to punishment," no constitutional violation has occurred.  Id. at 320 (citing Bell v. Wolfish, 441 U.S. 520, 539 (1979)).  Additionally, in determining what is reasonable, "courts must show deference to the judgment exercised by a qualified professional . . . [which] is presumptively valid . . . [unless] the decision . . . is such a substantial departure from accepted professional judgment . . . " that it can be said to be the result of poor decision making.  Id. at 322-23 (citations omitted); see also Bell, 441 U.S. at 544 (instructing that the court "should not second-guess the expert administrators on matters on which they are better informed . . . .")

(internal quotation marks omitted).

Abdul-Matiyn contends that he was unlawfully restrained on his ride from Sullivan to CNYPC.  However, Walsh indicated that, in his professional judgment, being transferred in restraints were necessary because "[i]nmates being transferred [we]re incarcerated for serious violations of the law and are being transferred to [CNYPC] based on serious concerns for their mental health."  Walsh Decl. ¶ 13.  As such, State defendants have provided a reasonable explanation for why restraints are reasonably related to inmate, resident, and corrections officers health and safety.  Moreover, the reason is based on the professional opinion of an individual charged with prison administration.  As such, Walsh's decisions deserve deference due to his experience, unless and until they have been proven to be the result of poor decision-making.  The record does not show, nor does Abdul-Matiyn present, any evidence which would raise a question of material fact concerning Walsh's ability to make such a decision and implement such a policy.

Accordingly, defendants' motion as to this claim should be granted.


### 3. Conditions of Confinement

States have a responsibility to provide those who are involuntarily committed with "adequate food, shelter, clothing, and medical care."  Youngberg, 457 U.S. at 315.  "If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed – who may not be punished at all – in unsafe conditions."  Id. at 315-16; see also DeShaney v. Winnebago County Dep't of Soc. Serv., 489 U.S. 189, 200 (1989) ("[W]hen the State . . . restrains an individual's liberty that it

renders him unable to care for himself, and at the same time fails to provide for his basic

human needs. . . it transgresses the substantive limits on state action set by the Eighth

Amendment and the Due Process Clause.").  While such claims are brought under the

Fourteenth Amendment, the Second Circuit suggests that "[c]laims for deliberate

indifference to a . . . serious threat to the health or safety of a person in custody . . . be

analyzed under the same standard" which evaluates such claims under both an objective

and subjective standard.  Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) (holding that

objective and subjective standards apply to conditions of confinement claims made by

pretrial detainees).  Given the similarly situated position of an individual committed

involuntarily, the Caiozzo standard serves as the analytical framework for this claim.

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . .

and subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an Eighth
> Amendment violation] when each would not do so alone . . . [such as] when
> the conditions have a mutually enforcing effect that produces the deprivation
> of a single, identifiable human need such as food, warmth, or exercise – for
> example, a low cell temperature at night combined with a failure to issue
> blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists."  Id. (citing

Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison

official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate

health or safety"  Farmer, 511 U.S. at 834 (citations omitted).

28

Abdul-Matiyn contends that he was not able to clean his room for the first five months he resided at CNYPC, that his bathroom was filthy and infested with bugs, and that State defendants never rectified the situation after receiving multiple complaints.  Dkt. No. 107-7 at 16-17.  Abdul-Matiyn asserts that he informed all State defendants, with the exception of defendant Payne, of these horrible living conditions.  Id. at 17.  However, even reading Abdul-Matiyn's contentions in the light most favorable to him, such allegations do not combine to deprive him of a human need.  Abdul-Matiyn makes no contention of how a dirty cell and the presence of bugs inhibited his ability to eat, sleep, or remain at an adequate temperature.  See Jackson v. Wiley, 352 F. Supp. 2d 666, 677 (E.D.Va. 2004) (granting summary judgment for defendants where prisoner alleged he was confined to a dirty cell, without proffering any contentions of harm or injury).  Additionally, there are no claims for resulting illness or injury.  At best, these are conclusory allegations, which are insufficient to sustain a constitutional claim.

Accordingly, State defendants' motion as to this claim should be granted.

### 4. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

[T]he Equal Protection Clause bars the government from selective

> adverse treatment of individuals compared with other similarly
> situated individuals if such selective treatment was based on
> impermissible considerations such as race, religion, intent to inhibit
> or punish the exercise of constitutional rights, or malicious or bad
> faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).

If an individual cannot "allege membership in [a protected] class, he or she can still prevail in . . . a class of one equal protection claim." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005) (internal quotation marks and citations omitted). Similarly, to succeed, a plaintiff must show "that he or she was intentionally treated differently from other similarly-situated individuals without any rational basis." Clubside, Inc. v. Valentin, 468 F.3d 144, 158-59 (2d Cir. 2006). Additionally, to be successful, plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves . . . ." Neilson, 409 F.3d at 104.

In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in CNYPC while similarly situated female sex offenders were not. Compl. at 25. However, State defendants have provided information that no females were released, with the same underlying convictions of either rape or sodomy, in 2006. Dkt. No. 107-9 at 4. While Abdul-Matiyn has attached various post-release information on random females granted parole from 2007 and 2008, the women were not convicted of the same crimes as Abdul-Matiyn. Dkt. No. 110 at 5-11. Accordingly, Abdul-Matiyn has failed to show that any other females, who were similarly situated, received treatment different than himself. Accordingly, Abdul-Matiyn has failed to establish the necessary elements of an Equal Protection claim.

State defendants' motion as to this claim should be granted.

30

**F. Eighth Amendment**

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain."  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted).  A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need.  Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66.  More than negligence is required "but less than conduct undertaken for the very purpose of causing harm."  Hathaway, 37 F.3d at 66.  The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need.  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer v. Brennan, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of

31

comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."   Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."  Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104, (1976).  "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. Id. at 703.  Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

### 1. July 6, 2005

City defendants do not contest the seriousness of Abdul-Matiyn's chest and back condition, but instead rely on the lack of sustained harm to demonstrate a lack of deliberate indifference.  City Defs. Mem. of Law (Dkt. No. 104) at 6-10.  Accordingly, as Abdul-Matiyn's claim is not against medical personnel, the gravamen of his allegations are that City defendants were deliberately indifferent in transporting him to the hospital and in providing treatment.

The Eighth Amendment analysis[19]I requires an objective and subjective showing, even

when the allegations are of intentional delay and not a medically diagnosable disease or

malady.  Smith v. Motefiore Med.Ctr. - Health Servs. Div., 22 F. Supp. 2d 275, 280-81

(S.D.N.Y. 1998).  "The seriousness of a medical need may also be determined by reference

to the effect of denying or delaying medical treatment," whereupon a showing that the

inmate "sustained substantial harm because of the delay in rendering of medical treatment,"

constitutes an Eighth Amendment violation.  Id. at 280; see also Smith v. Carpenter, 316

F.3d 178, 186-87 (2d Cir. 2003) (holding that when delay of medical treatment is the Eighth

Amendment violation, special attention needs to be paid to the outcome and not the

underlying serious medical condition, as treatment omissions resulting in "minor and

inconsequential" events are insufficient to state an Eighth Amendment claim, regardless of

the underlying medical condition).  The subjective standard is established as above.

In this case, Abdul-Matiyn fails to show the necessary substantial harm resulting from

City defendants' actions on July 6.  Abdul-Matiyn complained of chest pain, which

exacerbated his chronic back problems, and resulted in excruciating pain.  Dkt. No. 105-1 at

3-4.  Viewing the facts in the light most favorable to Abdul-Matiyn, upon informing

defendants Allen and Benbow of the pain they did nothing, when Valezquez arranged for

medical transport defendant Benbow called the infirmary and instructed them to put Abdul-

Matiyn "on the burn", and once arriving at the infirmary Rowe did not facilitate medical

---

[19]Abdul-Matiyn's primary allegations of deliberate indifference to his chest pains on July 6, 2005, and subsequent medical treatment, occurred while he was incarcerated at Riker's Island.  Therefore, unlike the other allegations in his complaint where he was a parolee who was involuntarily committed, these allegations relate to events which occurred while he was an inmate implicating Eighth Amendment standards.

attention for Abdul-Matiyn for several hours.  Compl. at 7-9.

However, it is undisputed that Abdul-Matiyn's chest pain started to decline before he was sent to the infirmary and had resolved itself when he spoke with physicians at the infirmary.  Dkt. No. 105-1 at 6; Compl. at 9.  Thus, there was no sustained substantial harm which accrued due to any delay.  In fact, the passage of time coincided with the dissipation of Abdul-Matiyn's symptoms.  This is insufficient to establish the objective prong of the Eighth Amendment analysis.  See McCoy v. Goord, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (dismissing Eighth Amendment claims against defendant because inmate failed to identify "what harm, if any, resulted from the delay in [his] treatment [of chest pains] . . . ."); Young-Flynn v. Wright, No. 05-CV-1488, 2007 WL 241332, at *19 (S.D.N.Y. Jan. 26, 2007) (holding that complaints of chest pain, without resulting burning sensation or other indications of a heart attack, failed to establish a substantial harm for which Eighth Amendment relief could be granted).

Additionally, Abdul-Matiyn's back pain was chronic, ever present, and consistently uncomfortable for him, both prior and subsequent to the day in question.  Dkt. No. 105 at 1-8.  Thus, nothing which occurred on July 5th added to, or subtracted from, his baseline health condition.  Therefore, it cannot be said that City defendants' actions resulted in any sustained substantial harm.  Accordingly, even viewing the facts in the light most favorable to Abdul-Matiyn, he has failed to establish a sustained substantial harm which satisfies the objective prong of the analysis.  As Abdul-Matiyn has failed to raise a question of material fact as to the objective prong of the analysis, the subjective prong need not be discussed.

Accordingly, City defendants' motion as to this claim should be granted.

34

## 2. Other Medical Requests at Rikers Island

For the same reasons as stated <u>supra</u>, any claims which Abdul-Matiyn attempts to allege occurred during the remainder of his time at Sullivan are also without merit.  In the five months that Abdul-Matiyn was incarcerated at Rikers Island, he was examined on at least twenty occasions, had multiple radiology tests done on his chest, spine, and abdomen, and had at least one appointment with a specialist.  Dkt. Nos. 105-1 at 7-8; 105-2, 105-3 at 3, 5.  Even crediting Abdul-Matiyn's contentions that on four or five occasions Benbow and Allen denied his medical visits for seeking treatment without their consent, the record is still replete with instances of treatment without delay and Abdul-Matiyn never suffered from any substantial harms due to the four or five occasions when he was allegedly denied examination.  Dkt. No. 105-1 at 10.  As Abdul-Matiyn has failed to raise a question of material fact as to the objective prong of the analysis, the subjective prong need not be addressed.[20]

Accordingly, City defendants' motion as to this claim should be granted.

## G. Conspiracy

"Section 1985 prohibits conspiracies to interfere with civil rights."  <u>Davila v. Secure Pharmacy Plus</u>, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a claim for relief under § 1985(3), a plaintiff must show:

---

[20] Abdul-Matiyn's allegations concerning his kidney and bladder stones primarily occurred while he was housed at CNYPC.  Treatment which Abdul-Matiyn received while at Sullivan was a sonogram which objectively indicated that no medical treatment was needed.  Abdul-Matiyn has failed to name anyone who was personally involved with that decision, or his care.  As such, any claims relating to the treatment of that condition need not be addressed here.

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29 (1983); see also Iqbal v. Hasty, 490 F.3d 143, 176 (2d Cir. 2007).  "In addition, the conspiracy must be motivated by some class-based animus."  Iqbal, 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn has failed to proffer any other allegations about Johnson, or any other defendants, and their alleged conspiratorial involvement.  As such, his claims are conclusory, fail to establish any agreement between the parties, and neglect to establish what type of class-base animus motivated the actions.  Such bare assertions are insufficient to withstand a motion for summary judgment.  See generally Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights.")

Accordingly, State defendants' motion as to this claim should be granted.


### H. Qualified Immunity

Finally, defendants claim that even if Abdul-Matiyn's constitutional claims are substantiated, they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken, 236 F. Supp. 2d at 229-30.

36

However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified or good faith immunity might still be available as a bar to a plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be reached concerning many of Abdul-Matiyn's claims because, for the reasons discussed above, Abdul-Matiyn has failed to raise a question of fact as to the first prong of the inquiry. Those claims for which it is recommended that defendants' motions be denied are addressed below.

**a. Prayer**

Defendants Hammer, Murphy, and Nowicki, the State defendants for whom it is recommended summary judgment be denied as to Abdul-Matiyn's prayer claim, seek qualified immunity on this claim. There is no dispute that at the time of Abdul-Matiyn's confinement at CNYPC, involuntarily confined individuals enjoyed a First Amendment right to participate in prayer and religious services. See subsection II(C)(2) supra. Moreover, defendants have proffered no fact sufficient to find as matter of law that their alleged

37

sporadic but repeated denials of Abdul-Matiyn's right to pray were done reasonably and in good faith.  Accordingly, State defendants' motion on this ground should be denied as to Hanmer, Murphy, and Nowicki.

### b. Strip-Search

Finally, State defendants Nowicki and Barbozza, those defendants for whom it is recommended summary judgment be denied on this claim, seek qualified immunity for the strip-search of Abdul-Matiyn at CNYPC on January 10, 2007.  As to the first prong of the analysis, it was held as early as 2002 in a case presenting strikingly similar facts that "it was clearly established on January 19, 2000 that a strip search of a psychiatric admittee, without individualized suspicion to believe that the admittee possessed drugs or weapon, violated the searchee's Fourth Amendment rights. . . ." Aiken, 236 F. Supp. 2d at 236.  As to the second prong, State defendants have offered no facts from which it could be determined that State defendants reasonably could have believed that the strip-search did not violate Abdul-Matiyn's rights. Accordingly, State defendants' motion on this ground should be denied as to Nowicki and Barbozza.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

A. City defendants' motion for summary judgment (Dkt. No. 102) be **GRANTED** and judgment be entered for Allen, Rowe, Valezquez, and Benbow on all claims;

B. State defendants' motion for summary judgment (Dkt. No. 107) be:

    1. **DENIED** as to:

        a. Hanmer, Murphy, and Nowicki on Abdul-Matiyn's First Amendment claim that he was denied the right to pray; and

        b. Nowicki and Barbozza on Abdul-Matiyn's strip-search claim; and

    2. **GRANTED** as to Hanmer, Murphy, Nowicki, and Barbozza on all other claims and to Johnson, Walsh, Farnum, Debroize, Forshee, Capolo, and Becker on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  March 4, 2010
       Albany, New York

                                  _David R. Homer_
                                  United States Magistrate Judge